Filed 7/15/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075380 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1501014) |
| DANIEL FRANK SEXTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County,

Elaine M. Kiefer, Judge.  Affirmed in part; reversed in part with directions.

William J. Capriola, by appointment of the Court of Appeal, for Plaintiff and

Respondent.

Xavier Becerra, Attorney General of California, Gerald A. Engler, Chief Assistant

Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige

Boulton Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Daniel Frank Sexton was convicted of several crimes committed against Jane Doe, his ex-wife.[1]  During the course of the investigation, Jane first accused him of domestic violence, later recanted her allegations, and then reverted to her original statements.  At trial, the jury received testimony from an expert who offered her professional opinion about statements typically made by victims of intimate partner battering.  Specifically, the expert asserted that it is not unusual for victims of intimate partner battering to cycle between periods of seeking assistance from law enforcement and of supporting their battering partners, including by making false statements to the police.

On appeal, Sexton challenges CALCRIM No. 850, the standard jury instruction regarding testimony by complaining witnesses in cases in which the jury also hears evidence from an expert in intimate partner battering.  The instruction directs the jury to limit their consideration of the expert testimony to their evaluation of whether the alleged victim's conduct was not inconsistent with the conduct of a victim who had been abused.  The instruction further directs the jury to take this analysis (of the consistency of the alleged victim's conduct with that of a victim of intimate partner battering) into account in evaluating the believability of the alleged victim's testimony.  Immediately preceding these directions, in its second sentence, the instruction plainly asserts that the expert testimony "is not evidence that the defendant committed any of the crimes charged against [him]."

---

[1]     We refer to the victim as Jane Doe, intending no disrespect.

Sexton claims the instruction would lead reasonable jurors to believe it directs them to impute their assessment of the credibility of an expert to that of the complaining witness with respect to the factual evidence of the alleged crimes. In other words, the instruction would suggest that if jurors find the expert to be credible, they should find the witness credible too. But the text of the instruction does not allow for an interpretation of this sort, and the instruction is not otherwise ambiguous or vague. Furthermore, the record indicates neither confusion on the jury's part, nor divergence from the standard text, nor any likelihood of misunderstanding the court's discussion of the instruction.

Sexton raises several additional issues. He claims that because Arizona's robbery statute does not contain all the elements of California's, including asportation, the true finding on the alleged Arizona prior conviction must be reversed and the five-year prior serious felony enhancement stricken. He also argues that the statutory dual punishment ban requires that the sentence on either count 3 (domestic violence) or count 4 (assault with force likely to cause great bodily injury) be stayed given that both counts were predicated on the same physical assault as part of a single course of conduct that had one objective, the infliction of physical and emotional harm on Jane. As discussed below, we agree with each of these arguments. Finally, Sexton seeks remand for the trial court to consider whether it should strike his prior serious felony enhancement under Senate Bill No. 1393, which the People concede is appropriate.

Accordingly, we reverse in part and provide directions to the trial court—to strike the prior serious felony enhancement and true finding regarding the Arizona robbery allegation, reconsider the sentence for the remaining prior serious felony enhancement in

3

light of Senate Bill No. 1393, stay the sentence on either count 3 or count 4, and resentence as to all counts. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Background*

Jane and Sexton's dating relationship began in 2007; by October they started to live together. They had two children—a son and a daughter—and were married in November 2010.

B.      *Incidents of Domestic Violence*

1.      *Uncharged Incidents Before 2014*

Jane testified about two incidents of uncharged domestic abuse committed by Sexton before 2014. In 2007, he pulled her out of the shower by her hair and slammed her against the wall by her throat. In 2011, he shoved her while she was holding their infant son.

2.      *The July 2014 Incident (Counts 1–5)*

At some point during July 2014, Jane told Sexton she wanted a divorce. On July 22, 2014, he told her that he would be in the house to pack up his belongings and leave, and not to come home until he had left. After some time, he sent her a text message falsely telling her that he had left and she could return to the house.

When Jane arrived home she found Sexton unconscious on the floor with a bottle of vodka nearby. But when he awoke, he seized her by the throat and began choking her. He told her that she should not have come home and threatened to kill her. She tried to escape and run after their children, who had fled the room, but he grabbed her by the hair

4

and continued to choke and threaten her. Sexton demanded sex; she stopped resisting; and he removed her clothes and tampon. He attempted to engage in sexual intercourse, but he could not produce an erection. At that point, he grabbed her by the hair, forced her mouth onto his penis, demanded oral copulation, threatened to kill her if she did not comply, and ejaculated into her mouth. She then vomited on him.

At work the following day, Jane's coworker observed marks on her neck that were "very faint" and "not very visible." Jane told the coworker about the assault and asked her to call the police if she ever missed work. When she returned home from work, Sexton apologized and promised he would never do something like that again.

### 3. *The August 2014 Incident (Counts 6-7)*

On August 15, 2014, Jane and Sexton argued about her attitude towards him since the July 2014 incident. According to Jane's testimony, he pushed her onto the floor, grabbed her by the throat, and picked up a ceramic vase over his head as if to strike her with it. He also verbally threatened to kill her.

### 4. *The February 2015 Incident (Count 8)*

In early February 2015, Jane decided to separate from Sexton. Without telling him, she and their children left the house and moved in her with her sister. A couple weeks later, Sexton called Jane and demanded she return home. He threatened: "If you don't come home by tomorrow, it's open season on anything and everything you love and care about." Jane's sister overheard the threat. Jane then contacted law enforcement, filed a report, and the following day obtained a temporary restraining order against him.

5. *The Uncharged March 2015 Incident*

On a morning in March 2015, Sexton appeared unannounced at Jane's sister's house, where Jane and the children were living, just as she was leaving with the two children. He pulled a gun and pointed it at her face, and the children ran off screaming. She tried to call 911 on her phone, but he threatened to kill her if she refused to put the phone down. They then together searched for and found the children, and they all returned to their own home together. With a gun on the table in front of him, Sexton threatened Jane again once they arrived. He told her to lie to her sister and say that she had decided to return to him of her own free will. He later directed her to testify that she had fabricated the allegations to gain leverage in their custody dispute when the domestic violence allegations proceeded to trial.

C. *Jane's Changing Allegations and Law Enforcement's Investigation*

After Jane reported Sexton to the City of Riverside police in February 2015, a patrol officer interviewed her. She discussed several incidents of domestic violence and described the incident from July 2014 as the most serious. Jane was also interviewed by a Riverside County deputy sheriff, and in March 2015, Jane's sister was interviewed by a Riverside police detective.

In April 2015, Jane informed law enforcement that she no longer wished to press charges against Sexton. She was told that irrespective of her assistance, there was enough evidence to proceed. Jane then recanted and said she fabricated the allegations.

More than a year and a half later, in January 2017, Jane spoke with an investigator in the Riverside County District Attorney's Office. She told him that her initial

allegations were true and that she had lied when she recanted so that she could protect Sexton from prosecution. Shortly thereafter, Jane's coworker was interviewed by the same investigator. The coworker stated that Jane told her about the July 2014 incident the day after it happened, including that Sexton choked her and forced her to have sex with him. She also reported having seen a bruise on Jane's arm at the time.

D.    *The Charges*

Sexton was charged with eight offenses relating to the abuse of Jane. Five of the charges pertained to the July 2014 incident: attempted spousal rape (Penal Code §§ 262, subd. (a)(1) & 664; count 1)[2]; forcible oral copulation (former § 288a, subd. (c)(2)(A); count 2)[3]; domestic violence (§ 273.5, subd. (a); count 3); assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); count 4); and criminal threats (§ 422; count 5). Two concerned the August 2014 incident: criminal threats (§ 422; count 6) and assault with a deadly weapon, i.e., a glass vase (§ 245, subd. (a)(1); count 7). And count 8, criminal threats, related to the February 2015 incident (§ 422; count 8). The prosecution alleged two prior serious felony convictions under section 667, subdivision (a)(1), which were also alleged as strike priors under the same section, subdivisions (b)–(i), and section 1170.12. At Sexton's request, the prior serious felony conviction allegations were bifurcated.

E.    *The Trial*

---

[2]    All statutory references are to the Penal Code except where otherwise indicated.

[3]    Penal Code section 288a was amended without substantive change and renumbered to section 287, effective January 1, 2019. (Stats. 2018, ch. 423, § 49.)

1.	*The Children's Testimony*

Both of Jane's and Sexton's children testified.  Their daughter testified that when the family was living together, she witnessed loud arguments and two incidents in which Sexton hit Jane.  She said that when she was living with Jane and her brother at her aunt's house, Sexton came to the house and "pulled up a gun," after which she and her brother ran away.  The son testified that although he never saw Sexton hit Jane, he recalled the morning his father came to his aunt's house with a gun.  He thought that Sexton was going to shoot Jane.

2.	*Expert Testimony on Intimate Partner Battering and Domestic Abuse*

A detective and master investigator for the Riverside County Sheriff's Department testified as an expert on intimate partner battering and domestic abuse.  She discussed the ways in which a victim of domestic violence can become slowly acclimated to various forms of abuse and the challenges victims face in recognizing abuse when the abusive behavior occurs gradually.  The expert opined relationships that include intimate partner battering typically cycle through several phases.  First, there is a "tension building phase where things are getting worse," followed by an "explosion phase where the crisis moment happens," and then a "honeymoon phase," after which victims often return to their battering partners.  She also asserted that during the honeymoon phase of this cycle, it is common for victims to not cooperate with law enforcement's investigation of their partners, to recant their statements, and provide a new narrative.

### 3. *Incidents of Domestic Violence Against Other Women*

In addition to Jane, three other women testified about abuse by Sexton. The first, Sexton's ex-wife, stated that in August 2005 after an argument about finances, she awoke to find Sexton choking her. She hit him and kicked him in defense, and he punched her in the face. She also explained that he was engaged in heavy drug use at the time. The second, an ex-girlfriend, testified that in April 1997 Sexton attacked her by hitting her, choking her, and pinning her to the ground. She reported the incident to the Phoenix Police Department. The third, another ex-girlfriend, testified that in November 1999 Sexton hit her several times during an argument, which left a bump on her head, and threatened to kill her.

### 4. *Sexton's Defense*

Sexton elected to testify in his own defense and denied all incidents of abuse against Jane. He admitted he had abused the three other women as they described in their testimony. He acknowledged his jealousy during the early part of his relationship with Jane, asserting that she would frequently receive calls and text messages from sometimes drunk ex-boyfriends, but he denied pulling Jane out of the shower by her hair or being violent with her. He discussed his concern about Jane and the children living with Jane's sister, whom he believed to be unstable. He admitted buying a gun, which was illegal due to his status as an ex-felon. He did not believe that Jane was aware he owned a gun. As to the incidents giving rise to the specific allegations, Sexton admitted that he and Jane engaged in oral sex during the July 2014 incident but stated it was consensual, and he denied choking her and attempting sexual intercourse against her will. He denied the

9

allegations relating to the August 2014 incident. On the February 2015 criminal threat allegations, he admitted calling Jane on the day in question but denied making the specific threat alleged and denied threatening to kill her.

F.      *Verdict and Sentencing*

The jury found Sexton guilty on counts 1 through 5 (the July 2014 incident) and count 8 (the February 2015 incident). He was acquitted on count 6 for criminal threats during the August 2014 incident. On count 7, arising from that same incident, the jury found him not guilty of assault with a deadly weapon but deadlocked on the lesser included offense of simple assault under section 240, on which the trial court declared a mistrial. Following discharge of the jury, the court found the allegations of Sexton's prior convictions to be true, but exercised its discretion under section 1385 and struck one of the two strike priors. (See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.)

Sexton was ultimately sentenced to state prison for a total term of 29 years and four months as follows: 12 years for count 2, the designated principal count (doubled the middle term); a consecutive two-year term each for counts 1, 3, and 4 (one-third the middle term, doubled); a consecutive one-year and four-month term for count 8 (one-third the middle term, doubled); the sentence for count 5 stayed (§ 654); and a consecutive 10-year term for the two five-year serious felony enhancements.

10

DISCUSSION

A.       *The Intimate Partner Battery Jury Instruction Was Not Erroneous*.

The trial court provided the jury with CALCRIM No. 850, "Testimony On Intimate Partner Battering and Its Effects:  Credibility of Complaining Witness," in its standard form as follows:

> "You have heard testimony from [an expert] regarding the effect of intimate partner battering.
>
> "[The expert's] testimony about intimate partner battering is not evidence that the defendant committed any of the crimes charged against him.
>
> "You may consider this evidence only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony."

Sexton challenges CALCRIM No. 850 in two ways.  First, he claims it is "impossible to allow the jury to use expert testimony about intimate partner battering 'in evaluating the believability of [the alleged victim's] testimony', . . . without allowing them to use it as proof that the complaining witness is telling the truth."  Second, he contests the narrowness of "the crimes charged against," arguing that this phrase "does not preclude the jury from using intimate partner battering evidence as proof the defendant committed *uncharged* crimes, from which the jury can then infer the defendant was disposed to commit the charged crimes."

In response, the People argue that the claim was forfeited for failure to object.  On the merits, they contend it fails because of the instruction's express meaning, the court's

11

appropriate admonishment that the jury was not to consider the expert testimony as evidence of Sexton's guilt, and that regardless, any error was harmless.

We review the claim of instructional error de novo, " 'in the context of the instructions as a whole and the trial record.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) Generally, an instruction may not be challenged on appeal unless the party made an appropriate objection at trial. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) But a challenge may be raised where the claim, like Sexton's here, alleges that the instruction was not correct in law or affected the defendant's substantial rights. (§ 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [not correct in law]; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 ["Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim"].)

As presented to the jury—i.e. in full, alongside the rest of the applicable instructions—CALCRIM No. 850 provides a clear, important and helpful reference. When jurors must decide whether to believe a witness's testimony, one thing they may reasonably consider is whether the witness's conduct is consistent with their expectations for an individual under the circumstances of the case. When those circumstances are the routine sort, the analysis might be straightforward. For instance, if the victim of an alleged carjacking provides wildly inconsistent descriptions of the perpetrator at different times, common sense may suggest that the victim's recollection of specific details should be questioned.

12

But when the facts are farther afield from a typical juror's life experience, or when they contrast with expectations for what may appear to be similar crimes, it can be helpful to hear from an expert on the relevant reference point. Intimate partner battering often presents such a case. Jurors typically expect the victim of a serious crime to report the incident as soon as possible. And they often view a significantly changing story as evidence that the allegations may be less than truthful. But as the expert in this case discussed, victims of intimate partner battering often act in ways that contrast with the actions of victims of other serious crimes. With that information in mind, the jury would have a more accurate reference for how to judge the victim's behavior and the consistency of the testimony. Rather than consider the testimony in relation to that of a typical witness or an alleged victim of serious assault generally, the jury ought to evaluate it with respect to an alleged victim of intimate partner battering.

Sexton does not challenge the purpose or principles supporting the use of the instruction, but argues that the text gets in its own way. Specifically, he points to the last phrase of the last sentence, which instructs the jury to consider the expert testimony "in evaluating the believability of the [alleged victim's] testimony." Because that phrase "authorized the jury to consider [the expert] testimony as evidence that Jane Doe was telling the truth, the jury would naturally infer that because the expert had described behaviors that matched those of Jane Doe in this case, she must have been telling the truth when she testified to abuse and lying when she denied it."

But Sexton's argument skates through its analysis of the phrase on which it relies, and it fails to interpret the text in context. The allegedly impermissible phrase—"and in

13

evaluating the believability of [Jane's] testimony"—expressly indicates that the jury is to *evaluate* the believability of Jane's testimony, not mechanically transfer their evaluation of the expert to Jane's statements. Furthermore, the trial court provided instructions on evaluating conflicting evidence and on limited purpose evidence in general, so they understood that "[w]hat is important is whether the testimony or any other evidence convinces" them. (CALCRIM No. 302.)

Read in context, the last sentence of the instruction contains a direction with specific and general aspects. Specifically, the jury is to use the expert testimony to help ground its analysis of the consistency of the complaining witness's conduct (by using a more informed reference point). The jury is then to use this 'consistency' analysis in its general evaluation of the believability of the complaining witness's testimony. In isolation, the breadth of the language in the last phrase might allow for a question regarding the manner in which the expert's testimony ought to bear on the jury's evaluation of the believability of the witness, but the first part of the sentence effectively resolves any such confusion. Reasonable jurors would not understand the instruction to mean that if they find the characteristics of intimate partner battering to be satisfied, this indicates that Jane was necessarily telling the truth. (See *People v. Brackins* (July 2, 2019, H043584) __ Cal.App.5th __ [2019 Cal.App. Lexis 612 at pp.*27–*30].)

Sexton's additional argument also fails to persuade. The second sentence of CALCRIM No. 850 informs the jury that "[The expert's] testimony about intimate partner battering is not evidence that the defendant committed any of the crimes charged against him." Following the introductory sentence, this is the first direction provided to the jury.

14

The instruction is thus structured to emphasize that above all else, the expert testimony does not constitute evidence of guilt on any of the charges. Sexton argues that it implies the inversion of its final phrase, that the testimony *is* evidence that Sexton committed any crimes of which he was *not* charged.

But we reject the suggestion that any reasonable juror would read the instruction in this manner. The importance of avoiding the implication that the expert testimony constitutes evidence of guilt is a good reason for the structure of the instruction as given. Moreover, there is no logical reason for any juror to believe the expert's testimony would be evidence the defendant committed the uncharged crimes but not the charged crimes. We therefore find the trial court did not err in giving CALCRIM No. 850 and furthermore, that given the evidence before the jury, any error was harmless under either the standard for federal constitutional errors (*Chapman v. California* (1967) 386 U.S. 18, 24) or those of only state law (*People v. Watson* (1956) 46 Cal.2d 818, 836).

Sexton's argument makes one more point worth mentioning. It would be theoretically possible to provide much more information in the instruction, even in the sentence challenged here. But the text of the sentence—and its prime placement in the context of the entire instruction—effectively expresses that the most important thing about the expert testimony is that it is *not* part of the evidence that the jury should consider when it evaluates the charges against the defendant. Sexton is free to argue both sides of this coin—that the instruction provides too much information, so the jury might be confused by a broad-sounding phrase shorn of context; and that it provides too little information, so the jury won't know what to do with it. But we recognize that a jury

15

instruction is a balance of clarity and depth, economy and precision, and we evaluate claims of instructional error with that in mind.

B.    *Because Arizona's Robbery Statute Does Not Contain All the Elements of California's, the True Finding on the Arizona Prior Conviction Must Be Reversed and the Five-Year Serious Felony Enhancement Stricken.*

Sexton was sentenced to a five-year term for the prior serious felony enhancement related to conviction for robbery in Arizona. The prosecution relied on a 1997 Information from Maricopa County, Arizona, charging Sexton with one count of robbery, as well as minutes from the trial court showing that he pleaded guilty to "robbery, a class 4 felony, nondangerous and nonrepetitive offense in violation of [Arizona Annotated Revised Statute, code sections] 13–1901, [13–1902, 13–701, 13–702, and 13–801] committed on April 8, 1997." For a prior felony conviction from another jurisdiction, such as Arizona, to support a prior serious felony enhancement, the crime must "include[] all the elements of any serious felony" in California. (§ 667, subd. (a)(1).) At the bifurcated trial on the priors, the prosecution described Arizona's robbery statute as "almost identical to the California statute," and the court noted that "it does contain all of the elements that are contained in the California Penal Code section for robbery, violation of Penal Code section 211."

Sexton argues that there are two ways in which Arizona's robbery statute fails to contain all the elements of California's: (1) it does not require asportation, and (2) it does not require that the person dispossessed of the property be the same person who experienced the force or fear element. On the first point, the People maintain that an opinion from the Court of Appeals of Arizona on which Sexton relies was wrongly

16

decided and inaccurately describes the elements of Arizona's robbery statute. On the second, they challenge Sexton's claim that California's robbery statute does not require the victim of the felonious taking be the same person subjected to the force or fear element.

In California, robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The " 'taking' " element consists of "(1) achieving possession of the property, known as 'caption,' and (2) carrying the property away, or 'asportation.' " (*People v. Gomez* (2008) 43 Cal.4th 249, 254–255.) Asportation is thus an element of robbery in California. (See *People v. Lopez* (2003) 31 Cal.4th 1051, 1054.)

In Arizona, the "taking" element of its robbery statute requires "obtaining possession of or dominion over property, and does *not* require that the property be moved."[4] (*State v. Aro* (Ct.App. 1997) 188 Ariz. 521, 524 (*Aro*).) In *Aro*, the court held that despite the express absence of asportation of the stolen property in the facts before it—the defendant removed an individual from a vehicle, took possession of the vehicle, but did not move it—the defendant was guilty of robbery. (*Id*. at pp. 522–524.) The People concede, as they must, that *Aro* stands for such a proposition, but still ask us to

---

[4]     "A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." (Ariz. Rev. Stats., § 13-1902(A).)

17

second-guess that court's statutory interpretation analysis without pointing to any caselaw from any Arizona court expressing a contrary opinion or otherwise questioning its decision. We decline to do so.

The People further argue that this issue was conclusively resolved against Sexton in *People v. Mumm* (2002) 98 Cal.App.4th 812. But that case examined the intent requirements of the California and Arizona robbery statutes, and the opinion did not discuss asportation or *Aro*. (*Id.* at pp. 814–819; see, e.g., *In re Chavez* (2003) 30 Cal.4th 643, 656 [cases are not authority for propositions not considered and decided].) Accordingly, in light of the clear guidance provided by *Aro*, *supra*, 188 Ariz. 521, we direct that the enhancement be stricken.[5]

C.      *The Consecutive Sentences for Counts 3 and 4 Violate the Dual Punishment Ban.*

The dual punishment ban codified in section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The purpose of the ban is to improve the congruity between punishment and culpability. (See *People v. Sanders* (2012) 55 Cal.4th 731, 742; *People v. Jones* (2012) 54 Cal.4th 350, 367.) Where there is separate punishment for multiple offenses arising out of a single course of conduct, we review whether substantial evidence supports a trial

---

5      In light of our conclusion, we find it unnecessary to address Sexton's additional arguments with regard to the enhancement.

court's finding that the defendant formed a separate intent and objective for each crime. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 886.)

In closing arguments, the prosecutor presented both count 3 and count 4 as relating to one action—Sexton's choking of Jane—which resulted in a visible injury to her neck.[6] The information charging Sexton, the trial court's nonspecific discussion of the counts, and the verdict forms were all consistent with this line of argument. Sexton did not previously challenge these two counts on section 654 grounds but raises the issue on appeal, as he is entitled to do. (See *People v. Hester* (2000) 22 Cal.4th 290, 295.)

In response, the People contend that substantial evidence supports an implied finding by the trial court that the two counts related to divisible acts, claiming that count 4 corresponded to hair-pulling during the incident, rather than choking. They further divide Sexton's intent, arguing that the purpose of the hair-pulling was to prevent her

---

[6] Count 3, inflicting an injury on a spouse, required the jury find that appellant willfully inflicted injury upon his spouse, and the injury resulted in a traumatic condition.

Count 4, assault with force likely to cause great bodily injury, required the jury find that appellant willfully committed an act likely to result in force that could produce great bodily injury, that when appellant acted he was aware that his act would likely result in the application of force, and that appellant had the ability to apply force likely to produce great bodily injury.

escape or protect the children, rather than to inflict physical pain, the objective of his choking.[7]

Jane described the conduct as follows:

> "[Sexton] started yelling at me that 'I told you not to come home.' He—grabbed me by my throat, and he started to choke me. . . . [¶] . . . [¶]
>
> "I was trying to pull his hands from my throat, and I managed to get his hands loose . . . . He was threatening me that I was going to die . . . and he was going to kill me." [¶] . . . [¶]
>
> "The kids ran out of the room. They were scared. They ran into my daughter's bedroom. I tried to run after them. He grabbed me by my hair, pulled me back, put his left arm around my throat. At this point, my back was facing him, his left arm around my throat, and [he] continued to choke and continued to threaten that he was going to kill me."

Apart from the passage quoted above, the People point to no evidence in the record that would support a finding that Sexton had a separate intent and objective for the two counts at issue. The testimony demonstrates that during the entire course of conduct, Sexton was threatening and choking Jane, except for a brief period when she managed to get his hands loose, after which he pulled her back to him and "continued to choke and continued to threaten" her.

---

[7] Because we conclude substantial evidence would not support a finding of a separate intent and objective, we need not address whether the prosecutor could argue to the jury that both counts were based on choking Jane, yet contend on appeal that separate punishment was permissible because count 4 *could be* based on hair pulling. (See *People v. Jones* (2012) 54 Cal.4th 350, 359 [record established that jury convicted defendant of three crimes based on a single act].)

The People offer two possible implied findings they believe are supported by substantial evidence. Under either of these scenarios, they connect the choking to count 3, given that this count requires a traumatic condition to result, which would be satisfied by the bruising on Jane's neck. (See *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1085.) Count 4, then, would necessarily relate to the hair-pulling. According to the People, two separate objectives for the hair-pulling are possible. Sexton might have taken this action to prevent Jane "from reaching the safety of her children" or "to prevent the children from witnessing the gravity of the acts."

First, the hair-pulling may or may not be a plausible basis for count 4 depending on, among other elements, the level of harm likely to be produced by such an act. Certainly the prosecutor never told the jury it was required to assess the likelihood that the hair pulling would produce great bodily injury in order to convict on this count. But even assuming it is, the People provide no cogent explanation for how their proposed objectives for the hair pulling were independent of, and not merely incidental to, the plainly-principal objective of harming Jane. (See *People v. Beamon* (1973) 8 Cal.3d 625, 639.)

If one's intent is to inflict harm on an individual who manages to free themself, then a subsidiary goal of the infliction of harm is to regain control of the individual. In such a case, however, the overarching objective throughout remains inflicting harm on the victim, and any subsidiary objectives—such as regaining physical control or shielding the harm from one's children—necessarily depend on the overarching objective and are therefore not independent. As Jane testified, after Sexton regained control he "continued

21

to choke and continued to threaten."  Even Jane's verb choices thus tend to show that his harm-infliction objective was continuous.  Substantial evidence therefore does not support an implied finding that any of Sexton's actions during the physical altercation were taken for a purpose other than his principal purpose, the infliction of physical and emotional harm on Jane.

D.      *Remand for Reconsideration of the Prior Serious Felony Enhancement Under Senate Bill No. 1393*

Sexton was sentenced to consecutive five-year terms for each of the two section 667, subdivision (a)(1) serious felony prior conviction allegations.  As discussed above, we agree with Sexton that the serious felony prior conviction enhancement related to the allegation of robbery in Arizona be struck.  We further agree with both parties that Senate Bill No. 1393, signed into law in 2018, now provides the trial court with the discretion to strike the second serious felony prior enhancement, which it may or may not choose to exercise on remand.  (Stats. 2018, ch. 1013, §§ 1–2.)  As the People note, Senate Bill No. 1393 applies retroactively to Sexton's conviction given the lack of finality.  (See *People v. Garcia* (2018) 28 Cal.App.5th 961, 973–975; see also *In re Estrada* (1965) 63 Cal.2d 740, 743.)

DISPOSITION

The judgment is reversed in part with directions to strike the prior serious felony enhancement relating to the Arizona robbery allegation, strike the true finding relating to the Arizona robbery as a strike and a serious felony enhancement, reconsider the sentence for the remaining prior serious felony enhancement in light of Senate Bill No. 1393, stay the sentence on either count 3 or count 4, and resentence as to all counts. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) In all other respects, the judgment is affirmed.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

23