Filed 12/4/20  P. v. Oskuie CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088693 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F06195) |
| v. | |
| KAYVAN MOHAMMAD OSKUIE, | |
| Defendant and Appellant. | |

Defendant Kayvan Mohammad Oskuie sexually assaulted his daughter on multiple occasions.  Following a trial, a jury found him guilty of two counts of committing a lewd and lascivious act upon a child under 14.  The trial court sentenced him to an aggregate term of 10 years in state prison.  On appeal, defendant contends the court prejudicially erred in:  (1) admitting expert testimony on child sexual abuse accommodation syndrome (CSAAS); (2) admitting expert evidence regarding the statistical probability of false accusations; and (3) instructing the jury, pursuant to CALCRIM No. 1193, that expert

1

testimony on CSAAS could be considered in evaluating witness credibility. Defendant concludes the cumulative prejudice arising from these errors requires reversal.

We conclude there was no prejudicial error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with two counts of lewd and lascivious acts upon a child less than 14 years (Pen. Code, § 288, subd. (a)).[1] The trial court suspended criminal proceedings under section 1368 and declared defendant mentally incompetent to stand trial. Several years later, the court found defendant competent to stand trial and reinstated criminal proceedings. The following evidence was adduced at trial.

Defendant was married to A.'s mother, S. A few years into their relationship, S. became aware of defendant's schizophrenia diagnosis. A. lived with her mother, her brother O., and defendant. When A. was three years old, S. had a "good touch" and "bad touch" conversation with her, and A. mentioned that defendant had touched her vagina. S. asked defendant about it, and he denied it. A. then "clammed up" and said nothing else. S. began sleeping in A.'s room and avoided leaving A. alone with defendant.

A. recounted an incident in 2011, when she was five years old. She sat on the living room couch with defendant, watching a basketball game on television. S. left the living room to take a bath. Defendant looked at A. and said, "[Y]ou know what that means." Defendant licked her vagina. He had done this "on multiple occasions," possibly four nights in a row. On this last occasion, A. kicked defendant's knee, ran to the bathroom where her mother bathed, and locked the door behind her.

A. recalled disclosing defendant's conduct to S. while S. was in the bathtub. However, S. remembered that A. told her the following day while they did an art project. S. told defendant's mother the following morning and had defendant leave the house. She did not call police because she focused on keeping A. safe. Defendant went to live

---

[1] Further undesignated statutory references are to the Penal Code.

2

with his parents, and S. brought the children to visit defendant about every two weeks to maintain "normalcy." During one of these visits, A. asked defendant to promise S. not to do anything bad again so he could come home.

Several months later, child protective services (CPS) received a report from A.'s kindergarten teacher that A. disclosed the 2011 incident with her father to a classmate, who told a parent, who told the teacher, a mandated reporter. Detective Darin Pometta with the Sacramento County Sheriff's Department's child abuse unit investigated the reported molestation. Detective Pometta spoke with S., who stated that A. first disclosed the incident while they did an art project.

A. participated in a special assault forensic evaluation (SAFE) interview with a CPS social worker. A. stated that, when left alone with defendant, he would "touch [her] boom-boom." She said he "did it more than one time." A. described the final incident, when defendant said, " 'You know what that means,' " and "licked [her] boom-boom" after removing her clothes. A. said she told her mother on a "different day"; she disclosed the incident because defendant would otherwise "keep doing it." A. also said that she disclosed the incident to some school friends while in kindergarten.

Detective Pometta interviewed defendant. Defendant said he was born in Iran and entered the United States with his parents as a teenager. He acknowledged his schizophrenia diagnosis and stated that he receives monthly Haldol injections. He had been married for 13 years and felt that his wife wanted to end the relationship due to his illness. According to defendant, "the voices [had] been trying to make [him] have sex" with his children since they were born. When Detective Pometta asked defendant about A.'s allegation that he put his mouth on her vagina, he denied it and claimed that his voices "did it to her." Defendant volunteered that it is "okay" to have sex with children in Iranian culture but that he has fought "this stuff" since entering the United States. He claimed that he was molested as a child in Iran.

Two years after A.'s initial SAFE interview, she participated in another SAFE interview. In this interview, A. said that she was three when defendant said, " 'It's time,' " and "licked [her] privates." A. said that defendant did this only "two times." At trial, A. acknowledged that this statement about "two times" was a lie because she wanted to see her father, who was in jail. A. also told the interviewer about an earlier incident when defendant licked her privates but stopped when her mother exited the bathtub.

The prosecution called psychologist Dr. Blake Carmichael, an expert on sexual abuse of children, to testify on CSAAS. He did not know A. and was not familiar with the facts of the case. Dr. Carmichael testified that children often delay reporting sexual abuse for a variety of reasons, including that the child relies on the abuser for care, that the child is told to respect the abuser as an authority, and that the child still values the relationship and is reluctant to see it end, particularly when the abuser is a family member. Dr. Carmichael testified that children often incrementally disclose details of the abuse as they feel more comfortable and only share certain details with certain people. As time progresses, the core details of the abuse remain, but children often confuse peripheral specifics, such as date, time, location, and number of incidents. Further, Dr. Carmichael discussed disassociation during sexual abuse, causing an abused child to emotionally distance from the incident by not focusing on the act while it occurs. He also elaborated on accommodation, which occurs when a child cannot escape the perpetrator due to a close relationship. He acknowledged that younger children can make incarnate reports due to suggestion from others, including suggestive questioning. Dr. Carmichael further testified that a number of different studies have concluded that false accusations of child sexual abuse are quite rare. He explained that the studies found the rate of false allegations by children was in the range of 1 to 6 percent.

Dr. William O'Donohue testified as an expert in forensic interviews of child sexual assault victims. Prior to testifying, he reviewed the case's CPS and sheriff's

4

department reports as well as the SAFE interview videos and transcripts. On cross-examination, Dr. O'Donohue conceded that a hypothetical scenario of a child revealing, without being asked, that he or she had been molested would "eliminate the concern about suggestibility." Dr. O'Donohue also testified that children commonly delay disclosure of molestation and that most perpetrators are known to the child. Finally, Dr. O'Donohue conceded that false allegations of sexual abuse from children are "rare."

A jury convicted defendant as charged. The court sentenced defendant to an aggregate prison term of 10 years.

## DISCUSSION

## I

### *Expert Testimony on CSAAS*

Defendant contends the trial court abused its discretion in allowing Dr. Carmichael to testify as an expert on CSAAS. There was no abuse of discretion.

Prior to trial, the prosecutor moved in limine to admit CSAAS testimony from Dr. Carmichael, primarily to counter the anticipated testimony of the defense expert, Dr. O'Donohue. During argument on the motion, the court first addressed whether CSAAS testimony was warranted, believing that the "alleged victim reported [the abuse] promptly afterwards." The prosecutor replied that the CSAAS testimony was primarily sought to explain the victim's "inconsistencies" to the jury, given that the defense expert planned to focus on her inconsistent version of events. Defense counsel confirmed that Dr. O'Donohue would focus on inconsistencies in A.'s reports. When asked by the court if she objected, counsel said, "I object but I think [Dr. Carmichael] comes in . . . ." The court noted that "[g]iven the circumstances if it will be competing expert testimony, it would be unfair to allow one side in and not allow the other side in." Accordingly, the court allowed both experts to testify. The court confirmed its decision to "allow both [experts] in since there is really no objection to either."

5

The prosecutor then filed a motion to limit Dr. O'Donohue's testimony, which was opposed by defendant. The court addressed this motion and limited Dr. O'Donohue's testimony to hypothetical scenarios, not permitting testimony on the specific content of A.'s SAFE interviews. Defense counsel also objected to Dr. Carmichael's pending testimony because the prosecution had provided no expert report, hindering her ability to cross-examine him. The court again inquired why CSAAS testimony was necessary under circumstances where this was not a "typical delayed reporting" case. In response, the prosecutor asserted that Dr. Carmichael would testify as to late reporting, incremental disclosure, disassociation, and accommodation. The prosecutor also clarified that Dr. Carmichael would not mention facts specific to the case. The court explained: "This is the situation. And I know Dr. Carmichael and there's another doctor that frequently testifies in this case. And it's kind of a – just a canned testimony about accommodation syndrome. And so I can totally understand why the D.A. doesn't get a separate report each time." To alleviate counsel's concerns, the court instructed the prosecutor to provide counsel with a transcript of Dr. Carmichael's previous CSAAS testimony and an outline of his anticipated testimony in this case.

Expert opinion testimony is admissible if the testimony is (1) "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and (2) "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801.) However, even when the jury has some knowledge of the subject matter, expert opinion may be admitted whenever it would assist the jury. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).) Unless " 'a manifest abuse of discretion is shown,' " a trial court's decision on the admissibility of expert testimony must not be disturbed on appeal. (*Id.* at p. 1299, quoting *People v. Kelly* (1976) 17 Cal.3d 24, 39.)

6

In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, and also to evaluate the believability of the alleged victim's testimony. In *McAlpin, supra*, 53 Cal.3d 1289 and *People v. Brown* (2004) 33 Cal.4th 892, our Supreme Court discussed with approval admitting CSAAS evidence to " 'disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin,* at p. 1301; *Brown,* at p. 906.)

In this case, Dr. Carmichael's testimony was relevant to help explain inconsistencies in A.'s reporting as well as incremental reporting. A. claimed that immediately after the last incident, she ran to her mother in the bathroom, but S. claimed that A. did not disclose until the following day. Moreover, A. did not tell her schoolmates until several months later. Further, A. testified at trial that the sexual acts occurred four times, but said it only happened twice in her second SAFE interview. At trial, A. acknowledged that this statement about "two times" was a lie because she wanted to see her father, who was in jail. These facts implicated issues with inconsistences, suggestibility, and incremental disclosure in child sexual abuse cases, which are matters beyond the common experience of a jury. These were the primary matters Dr. Carmichael discussed. Dr. Carmichael's testimony was relevant to explain faulty assumptions concerning when and how a child victim of sexual abuse may come forward about the abuse and that the failure to immediately report abuse or later minimize the abuse is not inconsistent with someone who suffered sexual abuse.

7

The court instructed the jury that Dr. Carmichael's testimony was not evidence that defendant committed any of the charged crimes, and that it could only consider his testimony when deciding whether A.'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony. Dr. Carmichael testified that he did not know A. and knew nothing about the case. The jury was not compelled to accept Dr. Carmichael's testimony or conclude that the inconsistences in reporting and incremental reporting here were due to CSAAS rather than fabrication or suggestion.

Defendant argues that the trial court erred in noting it would be unfair to allow the defense expert to testify and not the prosecutor's expert on "competing" expertise with respect to general issues like inconsistency and suggestibility. He cites two inapposite cases to support his position, *People v. Reardon* (2018) 26 Cal.App.5th 727 and *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732. We are not persuaded. In each of these cases, the trial court erred in refusing to admit defense expert testimony because it hindered the defendant's ability to present a defense. (*Reardon,* at p. 738 ["A criminal defendant's right to present his defense shows there will be cases where a defense expert's testimony should be admitted regardless of whether it is necessary"]; *Sotelo-Urena,* at p. 751 [holding that the trial court erred in excluding defense expert testimony that "was central to defendant's self-defense claim"].) Such is not the case here. That the trial court commented on the fairness of allowing both the prosecution and the defense to present expert testimony on CSAAS and issues regarding inconsistency and suggestibility does not mean that the court was unaware of the standard for admissibility or abused its discretion. Defendant has not shown a manifest abuse of discretion.

## II

### *Statistical Evidence on False Accusations*

Defendant contends that it was prejudicial error for the trial court to allow Dr. Carmichael to testify that research shows only 1 to 6 percent of sexual abuse allegations

by children are false.  The Attorney General concedes the inadmissibility, but claims defendant forfeited the claim by failing to object and the error is harmless.

Defendant's failure to object to the testimony forfeits his contention on appeal. (See *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].)  As to any ineffective assistance of counsel (IAC) claim, defendant did not raise and argue this claim under a proper heading.  Thus, the IAC claim is not properly raised in this appeal.  (*In re S.C., supra,* 138 Cal.App.4th at p. 408.)

After defendant's trial, the two pertinent California cases holding that this type of statistical evidence on false accusations is inadmissible were both decided.  We exercise our discretion to address the issue on the merits.  (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

Allowing an expert to testify regarding the statistical probability of false accusation sexual abuse cases has been, with rare exceptions, rejected by the courts. (See, e.g., *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, 737-738; *State v. Lindsey* (1986) 149 Ariz. 472, 476 [720 P.2d 73, 77]; *State v. Myers* (Iowa 1986) 382 N.W.2d 91, 92, 97-98; *State v. Parkinson* (Ct.App. 1996) 128 Idaho 29, 36 [909 P.2d 647, 654]; but see *Alvarez-Madrigal v. State* (Ind.Ct.App. 2017) 71 N.E.3d 887, 892-893 [finding expert testimony that some statistics show less than two or three children out of a thousand made up claims was not improper vouching].)  California courts have recently come to the same conclusion that such testimony is improper.  (*People v. Julian* (2019) 34 Cal.App.5th 878, 880, 887 (*Julian*); *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 (*Wilson*).)

We agree with *Wilson*, *Julian*, and the majority of other jurisdictions holding such evidence inadmissible.  "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of

9

fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.) Here, Dr. Carmichael's testimony that the rate of child sexual abuse victims making false accusations is only 1 to 6 percent implied to the jury that the victim here was likely telling the truth. Allowing Dr. Carmichael to give statistical probability evidence that usurped the jury's credibility finding function was an abuse of discretion.

In *Julian*, the expert testified, "false allegations of sexual abuse by children 'don't happen very often.' 'The range of false allegations that are known to law enforcement or [CPS] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.' " (*Julian, supra*, 34 Cal.App.5th at p. 885, italics omitted.) The Court of Appeal agreed with the defendant's contention that this testimony "was highly prejudicial, and deprived him of his right to a fair trial." (*Ibid*.) Defendant did not object to the evidence at trial, but the *Julian* court found counsel's ineffectiveness in failing to object deprived him of a fair trial under the *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674] standard of prejudice. (*Julian,* at p. 889.) The *Julian* court also found the defendant was prejudiced by trial counsel's soliciting from an investigating officer that the officer believed one of the children was truthful in making claims of sexual abuse against the defendant. (*Ibid*.) Finding these errors prejudicial under any standard of harmless error, the Court of Appeal reversed. (*Id.* at p. 890.)

The expert in *Wilson* "testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur 'very infrequently or rarely,' most often during a child custody dispute. He continued, 'There are a number of studies that talk about the pressures put on children to make a false allegation.' He referred to a 'classic' Canadian study that found 'about 4% of cases in which there was an allegation that was determined to be false,' remarking that '[w]hat was notable [about the study] was that in none of those cases was it a child who made the

allegation that was false, it was somebody else,' such as a parent disputing custody." (*Wilson, supra*, 33 Cal.App.5th at p. 568.) The expert admitted on cross-examination that it was difficult to determine whether an allegation is false, but the Canadian study was among the best available. (*Ibid*.) The expert also noted that the 12 to 15 other studies on the subject showed a range of 1 to 6 percent false allegations. (*Ibid*.)

The Court of Appeal found the testimony improperly admitted, but not prejudicial under the *People v. Watson* (1956) 46 Cal.2d 818 standard. (*Wilson, supra*, 33 Cal.App.5th at pp. 571-572.) In finding the error harmless, the *Wilson* court cited the relative brevity of the improper expert testimony, the fact that the expert acknowledged it was difficult to determine whether an allegation was false, and the expert's admission he had come across two cases where he believed the child he treated was making false claims of sexual abuse. (*Id.* at p. 572.) The Court of Appeal further relied on expert evidence submitted by the defense to rebut the improper expert testimony. (*Ibid*.) The defense expert "testified that the 4 percent number reflected only the cases in which there was positive proof a child's allegations were false, and that there was no way to know the actual ratio of true to false allegations." (*Ibid*.) The expert also noted there were many specific examples of false memories where children were influenced by adults investigating the alleged crimes or through interviewers using unreliable methods, and that false accusations are most likely to result from outside influences. (*Ibid*.) Finally, the prosecutor did not mention the statistical evidence in closing argument. (*Ibid*.) Thus, where the two victims "testified extensively and the jurors could assess their credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony, we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony." (*Ibid*.)

We agree with *Wilson* regarding the standard for harmless error to improperly admitted expert testimony on the statistical probability of false allegations of child sexual abuse. "The erroneous admission of expert testimony only warrants reversal if 'it is

11

reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations]." (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) Also, applying this standard, we conclude the error is harmless. The improper expert testimony took comparatively little time in the context of the entire trial. While Dr. Carmichael and Dr. O'Donohue agreed that false allegations of child abuse are rare, both experts also acknowledged that children can make false reports due to suggestive questioning.

Defendant's defense was not that A. made a false accusation but rather that A.'s report had been inadvertently suggested by S.'s hypervigilance. The prosecutor did not mention the statistical evidence in closing argument and did not dwell on the testimony regarding false allegations; he stated only that both experts agreed that false accusations by children are "extremely rare."

The evidence against defendant was based on (1) A.'s interviews and testimony and (2) defendant's statements during an interview with a detective. A. provided detailed testimony about the sexual abuse she endured. She made multiple reports to her mother and classmates. She first reported an incident to her mother when she was three, and she then reported a second similar incident to her mother when she was five. At trial, she testified that defendant licked her vagina on multiple occasions; in both her SAFE interviews, A. said the same. The significant discrepancy was the number of times it occurred. In her first SAFE interview and at trial, she said it happened four times; in her 2013 SAFE interview, she said it happened twice. A. explained this inconsistency at trial by stating that she lied in 2013 because she missed defendant, her father.

Defendant did not testify at trial. An interview with Detective Pometta was played for the jury. In this interview, defendant denied the allegations against him. He stated he has been diagnosed with schizophrenia and takes medication. He then explained that he hears voices in his head and these voices told him to have sex with his children. Defendant stated that the voices have been trying to make him have sex with his children

12

since their birth. Defendant stated he did not do what the voices were telling him to do. Instead, he claimed that the voices "did it to her." Defendant's admissions that "the voices" had sex with A., after admitting that these same voices had been trying to make him have sex with her since her birth, provide crucial corroboration to her testimony and pretrial statements.

The jury was instructed that it was the sole arbiter of fact and of witness credibility.

On this record, we conclude there was not a reasonable probability that defendant would have obtained a more favorable result in the absence of Dr. Carmichael's testimony on the statistical rates of false reports. We conclude the error was harmless.

## III

### *CALCRIM No. 1193*

Defendant asserts the trial court prejudicially erred by instructing the jury, pursuant to CALCRIM No. 1193, that expert testimony on CSAAS could be considered in evaluating the child witness's credibility. Because defendant did not object to this instruction at trial, he has forfeited the issue on appeal unless the error resulted in a miscarriage of justice. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

In *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), our Supreme Court held expert testimony concerning the behavior of rape victims to be admissible under Evidence Code section 801 "to rebut misconceptions about the presumed behavior of rape victims," but not "as a means of proving—from the alleged victim's post–incident trauma—that a rape in the legal sense had, in fact, occurred." (*Bledsoe,* at pp. 248, 251.) In *McAlpin, supra*, 53 Cal.3d 1289, a case involving the sexual abuse of a child, our Supreme Court explained: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—

13

is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at pp. 1300-1301, fn. omitted; see *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [expert testimony held to be admissible to explain a child's delay in reporting abuse is "not inconsistent with the secretive environment often created by an abuser who occupies a position of trust"]; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956 [expert testimony held to be admissible to explain a child's recantation of her molestation claim].)

Here, the trial court instructed the jury with CALCRIM No. 1193, as follows: "You have heard testimony from Dr. Blake Carmichael regarding [CSAAS]. [¶] Dr. Blake Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [A.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his [*sic*] testimony." According to defendant, "in evaluating the believability of [A.'s] testimony" is the portion of the instruction that violates the principles enunciated in *Bledsoe, supra*, 36 Cal.3d 236, *People v. Bowker, supra*, 203 Cal.App.3d 385, and *People v. Housley, supra*, 6 Cal.App.4th 947, because it "affirmatively invites the jury to apply the expert's testimony case-specifically to evaluate the believably of an alleged victim who testified at trial." But this is precisely what our Supreme Court allowed in *McAlpin, supra*, 53 Cal.3d 1289. There, expert testimony concerning the general behavior of parents of sexual abuse victims was properly admitted to assist the jury in evaluating the credibility of the specific victim's mother. (*Id.* at p. 1302.)

While *McAlpin* involved the admissibility of the expert testimony, and not the propriety of the limiting instruction, we conclude the instruction properly informs the jurors that they may use such testimony in evaluating the believability of testimony. Our

14

conclusion is further supported by the Fourth District Court of Appeal's analysis in *People v. Sexton* (2019) 37 Cal.App.5th 457, which recently rejected a challenge to identical language in CALCRIM No. 850, which applies to expert testimony about intimate partner battering.[2] There, the court reasoned: "Read in context, the last sentence of the instruction contains a direction with specific and general aspects. Specifically, the jury is to use the expert testimony to help ground its analysis of the consistency of the complaining witness's conduct (by using a more informed reference point). The jury is then to use this 'consistency' analysis in its general evaluation of the believability of the complaining witness's testimony. In isolation, the breadth of the language in the last phrase might allow for a question regarding the manner in which the expert's testimony ought to bear on the jury's evaluation of the believability of the witness, but the first part of the sentence effectively resolves any such confusion. Reasonable jurors would not understand the instruction to mean that if they find the characteristics of intimate partner battering to be satisfied, this indicates that Jane was necessarily telling the truth." (*Sexton,* at pp. 467-468.) We are persuaded by the *Sexton* court's reasoning and conclude there was no error.

## IV

### *Cumulative Error*

Defendant contends the cumulative effect of the errors violated his right to due process and a fair trial. Having found only a single instance of nonprejudicial error as discussed *ante*, we reject defendant's claim of cumulative error.

---

[2] CALCRIM No. 850 reads, in pertinent part: "You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of [her] testimony." (See *Sexton, supra*, 37 Cal.App.5th at pp. 465-466.)

## DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
HULL, Acting P. J.

/s/
DUARTE, J.