Filed 6/2/25  P. v. Melchor CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAUL MONCADA MELCHOR,<br><br>    Defendant and Appellant. | H051360<br>(Santa Clara County<br>Super. Ct. No. C2209169) |

Defendant Raul Moncada Melchor was convicted by jury of, among other things, assault with the intent to commit rape and multiple counts of inflicting corporal injury on a domestic partner.  Defendant argues on appeal that the trial court committed misconduct by repeatedly commenting on the domestic partner's tearful demeanor during her testimony; that the pattern jury instruction on intimate partner battering is legally incorrect; and that the errors were cumulatively prejudicial.  He further contends the trial court improperly proceeded to a bench trial on aggravating circumstances alleged in the complaint without first obtaining defendant's waiver of his right to jury trial.

As we will explain, some of the trial court's comments describing the witness's demeanor—made in the jury's presence—were improper but not prejudicial to defendant's fair trial.  We will, however, reverse the judgment because the trial court failed to obtain a jury waiver from defendant before conducting a bench trial on the aggravating circumstance allegations, and we find the error prejudicial here.  In addition, the parties agree that the abstract of judgment must be corrected to accurately reflect the

fines and fees imposed by the trial court. The error appearing on the abstract of judgment can be remedied on remand.

## I. TRIAL COURT PROCEEDINGS

Defendant was charged by information with assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 1); forcible rape (Pen. Code, § 261, subd. (a)(2); count 2); assault with intent to commit rape (Pen. Code, § 220, subd. (a)(1); count 3); three counts of inflicting corporal injury on a domestic partner after a prior conviction (Pen. Code, § 273.5, subd. (f)(1); counts 4, 5, and 7); and making criminal threats (Pen. Code, § 422, subd. (a); count 6). All counts relate to the same victim. As to two of the corporal injury offenses, the information alleged defendant personally inflicted great bodily injury under circumstances involving domestic violence. (Pen. Code, § 12022.7, subd. (e); unspecified statutory references are to the Penal Code.)

### A. TRIAL EVIDENCE

#### 1. Charged Offenses

Maria Doe testified with a Spanish-language interpreter. (As in the trial court, we use the pseudonym surname in the interest of privacy. (See Cal. Rules of Court, rule 8.90.)) She met defendant in June 2021. They had a dating relationship and lived together for four or five months. She testified that he was violent toward her many times during the relationship. They broke up and she moved out of his residence in February 2022. We focus here on Maria's testimony about the charged offenses, which all occurred after the relationship ended. Defendant challenges four comments made by the trial court about Maria's tearful demeanor, which we will discuss in Part II.A., *post*.

##### a. March 2022 Incident (Count 7)

Maria testified that she agreed to go with defendant to a nightclub, where they drank alcohol and danced. Defendant became jealous when men looked at Maria. She asked to leave because she thought he "was going to start being aggressive" with her. He insulted her as they walked toward his vehicle. Defendant then punched her in the face

2

and she fell to the ground. She removed her shoe and threw it at him to defend herself. Defendant continued to hit her while she covered her face. A bystander intervened, defendant hit the bystander, and Maria walked toward defendant's vehicle because her phone and purse were locked inside. Defendant eventually opened the door and threw Maria's items at her while calling her a " 'bitch' " and a " 'whore.' "

Maria walked away toward a gas station, but defendant drove after her. He blocked her path, got out, and told her to get in. When defendant started pulling her inside, another bystander said leave her alone and defendant responded, " 'Don't butt in. Fuck off. This is my woman.' " The bystander walked toward the gas station. Defendant then grabbed Maria by the neck with both hands and forced her into the vehicle. Defendant grabbed her so tightly that she was not able to breathe. She blacked out briefly, and when she regained consciousness, defendant was driving.

Maria's neck was sore, and she could not speak for about 30 minutes. She tried to lower a window to ask for help. Defendant hit her "really hard" with his fist, and kept hitting her while still driving. Maria eventually convinced defendant to drop her off at a hospital.

A nurse who treated Maria at the hospital that night testified that there was "tenderness" on the back of Maria's head; swelling in her chin area; bruising on her face; and eye redness. Her neck was bruised with circular marks, and there was some redness and discoloration on her upper chest. A different nurse testified that Maria still had visible injuries during a follow up exam a few days later. According to the nurse, Maria reported "changes in vision, spots, some hearing buzzing in her ears, some dizziness, headaches intermittently, and a change in her voice tone, as in raspy or hoarse voice."

### b. June 2022 Incident (Counts 5 and 6)

Maria testified that she agreed to meet defendant again in June 2022. Defendant told her he wanted to take her out to eat and that he would not hurt her. They ate, started arguing on the way back to defendant's residence, and then he assaulted her. She told

him she did not want to see him again and asked for some personal belongings that were at his residence. She tapped the dashboard of the vehicle, and he hit her in the face. She put her hands on his shoulders to push him away, which made him more angry. He punched her in the face with both fists. She fell out of the open door and hit her head on the sidewalk, "kind of fainted," and experienced blurred vision.

Defendant put her back into the vehicle and drove to another area to park. She asked him several times to take her to the hospital and he refused. When she honked the horn to try to get help defendant became furious. A man approached and asked about the commotion. Defendant told the man that Maria was drunk, and he was able to convince the man to leave. Maria eventually took defendant's phone and walked to the hospital. She reported defendant's conduct to hospital staff and received treatment. Defendant called Maria "day and night" following the June 2022 incident.

### c. July 2022 Incident (Counts 2 through 4)

Maria testified that she agreed to allow defendant to drive her to run some errands in July 2022. They returned and defendant parked in front of her residence. He "became violent" for no reason and got on top of Maria in the vehicle. He yelled at her, calling her a " 'bitch' " and a " 'whore.' " When defendant noticed someone in another car filming them, Maria got out and went inside her home. Defendant drove away.

Defendant called her several times that day and returned to her residence. Maria went outside to see him because she did not want anything to happen to her pregnant housemate. After she agreed to get into the vehicle to talk, he locked the doors and drove away quickly. Defendant appeared furious and was driving "really fast." He parked on a dark street near a fast food restaurant. He said, " 'Get out. Let's go to my room. I want to fuck you.' " She refused, and he got "really mad."

Defendant got on top of Maria in the passenger seat. He said, " 'I'm going to fuck you, even if you don't want to. We're going to do this, either you want it or not.' " He unbuckled his pants, and pulled down her pants. She tried to push him away but could

4

not. He kissed and bit her neck. He put his erect penis into her vagina. Maria tricked defendant into stopping by agreeing to go to his residence. She ran from defendant as they got out. Defendant followed Maria in the vehicle, yelling at her. He threw a glass bottle at her, which hit her arm and leg. Maria saw a patrol car and ran to it. Defendant fled. One of the officers from the patrol car testified at trial that Maria reported defendant physically and sexually assaulted her. The officer observed bruising on Maria's left arm and scratches and bruising on her left shoulder.

### d. July 2022 Incident (Count 1)

Maria testified that she agreed to help defendant with a car insurance issue on the afternoon of July 18, 2022. She agreed to help him because she "knew how he would ... get" if she refused. They ate pizza in his vehicle next to a park, and they drove to a store, where he bought some food. He wanted her to go to his residence with him. She acquiesced after he started raising his voice because she did not want him to "get violent with [her]." But Maria decided not to go inside the residence because defendant continued demeaning her by calling her names like " 'stupid bitch.' "

Maria walked to a gas station near her residence. Defendant was parked at the gas station when she arrived. Maria agreed to sit in the vehicle to talk with defendant. They talked briefly and then defendant got on top of her and "went straight to [her] neck with both his hands." She could not breathe. She tried to push him away. Eventually he stopped strangling her and pushed her forcefully away. Maria called 911.

A San Jose police officer testified about responding to Maria's 911 call. The officer observed that the side of Maria's neck was red. Maria was "crying hysterically" and appeared scared. The officer did not see any injuries on defendant.

### 2. Uncharged Conduct Involving Other Women

A woman named Daniela testified that she was married to defendant from 2014 to 2018. She recounted several instances of domestic violence perpetrated by defendant, including defendant throwing things at her, strangling her, and punching her.

A woman named Anahi testified that in 2020 she lived in an apartment with a woman defendant was dating. Anahi testified that in October 2020 she saw defendant slap the woman and call her a whore.

### 3. Intimate Partner Violence Expert Testimony

A marriage and family therapist testified as an expert in "domestic violence and the common experience of recipients of intimate partner violence." The expert made clear he did not know defendant or Maria, nor did he know any facts related to the case. He was there to educate the jury on intimate partner violence and how it can manifest in alleged victims. The expert testified that domestic violence includes both physical violence and emotional or psychological abuse. Emotional abuse can include isolating the victim, "[b]adgering" the victim with phone calls or text messages, and verbal harassment. The expert described that sexual violence can be "profoundly degrading and utterly destructive of the will to resist." The expert stated there is "enormous variation" in the way people respond to domestic violence, and it would not be unusual for a person who was raped to later have consensual sex with the rapist.

The expert testified to common misconceptions about intimate partner violence: a victim will report the abuse; a victim will leave the abuser; and a victim will cooperate in prosecuting the abuser. The expert testified that instead, some victims fail to report abuse and remain with abusive partners because they have intense affection for the abuser; others face cultural pressure to maintain relationships; financial needs can be another reason a victim will remain with an abusive partner.

### 4. Defense Character Witness

A woman who rented a room to defendant in 2021 and 2022 testified about interactions she observed between defendant and Maria Doe. The woman testified that she saw Maria spit in defendant's face in the living room one time. She testified that Maria sometimes threatened to call the police during verbal arguments with defendant. She testified that on a different occasion, she saw Maria fall down in the doorway and

6

then blame defendant for pushing her, but defendant was too far away to have pushed Maria. The woman testified that on another occasion defendant and Maria "were in the living room arguing and all of a sudden she slapped him." The woman testified she never saw defendant strike Maria.

### B. DELIBERATIONS, VERDICTS, AND SENTENCING

The jury deliberated over four days, beginning in the late afternoon of the first day and reaching a verdict in the late afternoon of the fourth day. The jury found defendant guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 1); assault with intent to commit rape (§ 220, subd. (a)(1); count 3); and three counts of inflicting corporal injury on a domestic partner after a prior conviction (§ 273.5, subd. (f)(1); counts 4, 5, and 7). The jury found defendant guilty of attempted rape as a lesser included offense of count 2 after finding defendant not guilty of the charged rape. The jury found defendant not guilty of making criminal threats (count 6) and found not true two allegations that defendant personally inflicted great bodily injury.

Defense counsel indicated while the jury was deliberating that defendant "would be agreeable to waiving jury on the aggravators and come back on another day and argue aggravators to the Court." The trial court did not receive a personal waiver from defendant. The trial court found the following five aggravating circumstances true after a bench trial: the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty; defendant engaged in violent conduct that indicates a serious danger to society; defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness; defendant was on probation when the offenses were committed; and defendant's prior performance on probation or supervision was unsatisfactory. (Cal. Rules of Court, rule 4.421(a)(1), (b)(1), (b)(2), (b)(4), (b)(5).) Defendant was sentenced

7

to nine years eight months in prison, including the principal upper term of five years on one of the corporal injury counts.

## II.    DISCUSSION

### A. DEFENDANT WAS NOT PREJUDICED BY THE TRIAL COURT'S IMPROPER COMMENTARY

The trial court pre-instructed the jury at the start of trial, "Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."  Near the beginning of Maria's testimony, the trial court observed, "For the record, the witness has become tearful. [℣] We try to say things for the record that we all see but that the transcript would not know without us saying. [℣] So on occasion you might hear from me describing what's going on for the record.  And counsel are encouraged to do the same."

A trial court "may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause."  (Cal. Const., art. VI, § 10.)  Any comment by the court "must be accurate, temperate, nonargumentative, and scrupulously fair."  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 766.)  "The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made."  (*People v. Melton* (1988) 44 Cal.3d 713, 735.)  Reversal is required for judicial misconduct if a result more favorable to the defendant is reasonably probable but for the misconduct.  (*People v. Harris* (2005) 37 Cal.4th 310, 350–351 (*Harris*) [applying state-law prejudice standard to judicial misconduct claim related to the "tone, form, and number of questions posed" by the court].)  A defendant's federal constitutional due process right to an impartial judge is implicated only where the court's " 'behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' "  (*People v. Snow* (2003) 30 Cal.4th 43, 78.)  Importantly, a "a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review."  (*People v. Seumanu* (2015)

61 Cal.4th 1293, 1320 (*Seumanu*).) Our review is de novo. (*People v. Williams* (2021) 60 Cal.App.5th 191, 202.)

Defendant challenges four comments by the trial court, which we reproduce here with relevant context. After observing that Maria had pointed to her right side when demonstrating where defendant kicked her, the trial court added, "And also for the record, the witness has been visibly distraught throughout her testimony." During a pause in testimony to allow for a change of interpreters, the court stated, "For the record, the witness has been -- appeared visibly distraught and tearful throughout her testimony." The court later asked Maria if she was having trouble breathing and stated, "For the record, the Court needed to inquire, because at times it looked like she was hyperventilating and I was concerned for her safety." And after audio of phone calls between Maria and defendant were played, the following exchange occurred: "[Trial court]: Counsel, I'd like to ask you to state for the record the witness's demeanor while the calls were being played, if either of you were observing. If not, the Court will do it. [¶] [Prosecutor]: I was not observing for the entirety of the calls, because I was following along with the transcript. [¶] I notice, at this point, the witness appears to be crying and -- appears to be highly emotional. [¶] [Trial court]: As the calls were being played she had her eyes closed, breathing heavily at times, visibly distraught, crying. [¶] And then at a certain portion she leaned over on to the desk of the witness stand with her head in her hands." Defense counsel responded, "Submitted," after the trial court's description.

Although defense counsel did not object to any of the challenged comments during Maria's testimony, counsel objected outside the presence of the jury after Maria was excused as a witness. Counsel argued the trial court's characterizations of Maria as "distraught" and "emotional" went beyond mere descriptions "such as crying or breathing hard." Counsel observed, "The Court never commented when she was hostile to defense counsel when she didn't want to answer questions on Friday." The court responded by noting it had "repeatedly encouraged counsel to describe for the record the nonverbal

9

gestures and emotions shown by the witness." The court also noted the jury would again be instructed with CALCRIM No. 3530 after the close of evidence: "Do not take anything I said or did during the trial as an indication of what I think about the case, the evidence, or what the verdict should be. It's not my role to tell you what your verdict should be. You are the sole judges of the evidence and believability of witnesses. It is up to you, and you alone, to decide the issues in this case. You may disregard any or all of my comments about the evidence or give them whatever weight you believe is appropriate."

Defendant did not seek timely correction *during* Maria's testimony, which is necessary to preserve the issue. (*Seumanu*, *supra*, 61 Cal.4th at p. 1320.) But even considering the argument on the merits, we find no prejudice from the trial court's improper comments. We emphasize, however, that our conclusion as to prejudice should not be interpreted as an endorsement of the trial court's repeated reference to Maria's emotional demeanor, which the trial court stated it was describing because it was "very mindful of having an accurate record." It is proper, and in fact helpful to a reviewing court, to describe a witness's demonstrative gestures and nonverbal answers, such as pointing at an exhibit or to a body part. But in a jury trial, the court must refrain from describing a witness's general expression of emotion when the jury is present. Such commentary risks invading the jury's exclusive province to determine witness credibility. A witness's demeanor while testifying is also generally not relevant to appellate review because we do not revisit the jury's credibility determinations. However well-intentioned for the sake of creating "an accurate record," describing a testifying witness's demeanor is in effect a judicial comment to the jury about the evidence, calling attention to particular aspects of a witness's testimony and effectively providing the court's interpretation of the witness's behavior while testifying. Such comments from the court should be offered with restraint and purpose. To the extent the trial court believes the

10

record should reflect some aspect of a witness's demeanor, such comments should generally be made outside the jury's presence.

On the facts here we find no prejudice from the trial court's commentary. The court instructed the jury both at the beginning and the end of trial to "not take anything [it] said or did during the trial as an indication of what [it] thinks about the case, the evidence, or what the verdict should be." (*Harris*, *supra*, 37 Cal.4th at pp. 350–351 ["We must assume the jurors followed their instructions"].) Importantly, the prosecution's case was supported not only by Maria's testimony but also by testimony from peace officers and medical professionals about the injuries they observed. Defendant has not demonstrated a reasonable probability of a more favorable result had the court refrained from offering its descriptions. Nor do we find the challenged statements so prejudicial as to deny defendant a fair trial.

Defendant suggests that the "jury undoubtedly struggled with the question of whether Maria's accounts were credible" based on the jury deliberating over the course of four days and submitting nine questions to the court in the process.[1] He also notes the jury rejected the great bodily injury allegations, found defendant not guilty of making criminal threats, and found defendant guilty of only the lesser included offense of attempted rape rather than forcible rape as charged. But those details equally reveal a jury that took its job seriously, carefully analyzed the evidence associated with many counts, followed the court's instructions, and returned guilty verdicts only where the prosecution proved its case beyond a reasonable doubt.

Defendant contends the trial court's comments "bolster[ed] Maria's credibility" and "likely made a difference." He argues "it is not hard to imagine" the court's comments "could have influenced the jury into believing other of her stories." But those

---

[1] We see only one of those nine questions in the record on appeal, which was a request for a readback of Maria's testimony about the charged rape.

11

arguments do not reflect the applicable prejudice standard, and we have explained why we find the trial court's comments did not amount to prejudicial misconduct.

## B. THE JURY INSTRUCTIONS WERE NOT ERRONEOUS

Defendant argues that instructing the jury about intimate partner violence using CALCRIM No. 850 permitted jurors to consider that evidence for the improper purpose of determining whether Maria's allegations were true. Our task in reviewing a purportedly erroneous instruction is to decide whether it is reasonably likely, viewed in the context of the instructions as a whole, that the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We review defendant's argument despite his failure to object at trial because " '[w]hether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim.' " (*People v. Ngo* (2014) 225 Cal.App.4th 126, 149; § 1259 ["The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

The jury was instructed with CALCRIM No. 850 as follows: "You have heard testimony from Richard Ferry regarding the effect of intimate partner violence. Mr. Ferry's testimony relates to a pattern of behavior that may be present in domestic abuse cases. [¶] Testimony as to intimate partner violence is offered only to explain certain behavior of an alleged victim of domestic violence. Richard Ferry's testimony about intimate partner violence is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not Maria Doe's conduct was consistent with the conduct of someone who has been abused and in evaluating the believability of her testimony."

Multiple courts have rejected the argument that allowing the jury to use expert testimony to evaluate a witness's believability (by instructing with CALCRIM No. 850)

amounts to using that testimony to prove abuse occurred.  (*People v. Brackins* (2019) 37 Cal.App.5th 56, 71; *People v. Sexton* (2019) 37 Cal.App.5th 457, 467.)  Given the expert's appropriately limited testimony, we see no likelihood that the jury was misled or confused by this instruction here.  As a result, defendant's related argument that the instruction lowered the burden of proof also fails.

## C.  NO CUMULATIVE PREJUDICE

We have found no trial error and we have found any arguable error related to the trial court's comments on the evidence independently harmless.  Defendant's cumulative prejudice argument necessarily fails.

## D.  AGGRAVATING CIRCUMSTANCES

"Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' "  (*Cunningham v. California* (2007) 549 U.S. 270, 288–289.)  A defendant therefore has a federal constitutional right to jury trial on aggravating circumstances alleged in a charging document.  Waiver of that right must be made "by the consent of both parties expressed in open court by the defendant and the defendant's counsel."  (Cal. Const., art. I, § 16.)  "When the constitutional right to jury trial is involved, we have required an express waiver even in cases in which the circumstances make it apparent that all involved—the trial court, the prosecutor, defense counsel, and the defendant—assumed that the defendant had waived or intended to waive the right to a jury trial."  (*People v. French* (2008) 43 Cal.4th 36, 47.)

The California Supreme Court has offered guidance to ensure that a jury waiver is knowing and intelligent.  (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 169.)  The *Sivongxxay* court recommended that "trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously

13

agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Ibid.*) The court further recommended that trial courts take additional steps to ensure the defendant comprehends what the jury trial right entails, such as "by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived." (*Id.* at pp. 169–170.)

It is undisputed the trial court failed to obtain an express waiver of jury from defendant before proceeding to a bench trial on aggravating circumstances. Defendant argues the error is structural, citing *People v. Ernst* (1994) 8 Cal.4th 441, 448, which concerned the denial of a defendant's constitutional right to jury trial on a charged offense. The Attorney General argues any error is harmless beyond a reasonable doubt. (Citing *People v. Lynch* (2024) 16 Cal.5th 730, 775 (*Lynch*) [requiring reversal "unless, after examining the entire cause, including the evidence as to all relevant circumstances ([citation]), we can conclude that the omission of a jury trial was harmless beyond a reasonable doubt as to *every* aggravating fact the trial court used to justify an upper term sentence."].) We need not determine the appropriate prejudice standard because we find the error here prejudicial under any standard.

The jury found not true two great bodily injury allegations. It also found defendant not guilty of two counts (forcible rape and making criminal threats), convicting him instead on the lesser included offense of attempted rape. Yet the trial court found, among other aggravating circumstances, that the crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty; and that defendant engaged in violent conduct that indicates a serious danger to society. (Cal. Rules of Court, rule 4.421(a)(1), (b)(1).) On this record, it is plausible that the jury may have found in defendant's favor on one or more of the aggravating circumstances.

14

(See *Lynch*, *supra*, 16 Cal.5th at p. 776.)  The matter must therefore be remanded for a personal waiver or jury trial on the aggravating circumstances.

### E. CORRECTING THE ABSTRACT OF JUDGMENT

The parties agree that the abstract of judgment must be amended to remove a $10,000 restitution fine (§ 1202.4, subd. (b)) that the trial court imposed and stayed based on defendant's inability to pay.  At sentencing, the trial court ordered the restitution fine "imposed and stayed pursuant to the ability to pay presentation by defense."  The abstract of judgment must be corrected on remand to reflect the trial court's determination.

### III.    DISPOSITION

The judgment is reversed, and the matter is remanded for the limited purpose of defendant personally waiving or demanding jury trial on aggravating circumstances. Upon conclusion of the additional proceedings, defendant shall be resentenced.

15

_____

Grover, Acting P. J.

**WE CONCUR:**

_____

Lie, J.

_____

Wilson, J.

H051360
*The People v. Melchor*