Filed 12/30/25  P. v. Magallon CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>VICTOR DAVID MAGALLON,<br>        Defendant and Appellant. | A171742<br><br><br>(Sonoma County<br>Super. Ct. No. SCR7447171) |

This is an appeal from final judgment after a jury convicted defendant Victor David Magallon of two counts of continuous sexual abuse of a child and one count of assault with intent to commit rape, sodomy, or oral copulation. The triers of fact also found true a multiple-victim allegation and several aggravating factors, leading to a 28-year sentence.

Defendant seeks reversal on the grounds that the trial court prejudicially erred by permitting an expert to opine on child sexual abuse accommodation syndrome (CSAAS) and instructing the jury that it could consider the expert's testimony to assess the victims' credibility and, in doing so, to prove the truth of their allegations. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 10, 2023, defendant was charged by an amended information with continuous sexual abuse of Jane Doe 1 and Jane Doe 2, children under

1

the age of 14 (Pen. Code, § 288.5, subd. (a); counts 1 and 3),[1] and assault of Jane Doe 1 with intent to commit rape, sodomy, or oral copulation (§ 220, subd. (a)(2); count 2).  Multiple victims were alleged pursuant to section 1203.066, subdivision (a)(7), and aggravating factors were alleged pursuant to California Rules of Court, rule 4.421(a)(1)–(a)(12), (b)(1)–(b)(3), and (b)(5).[2]  Defendant pleaded not guilty and denied the allegations.  Thus, trial began on November 20, 2023.[3]

## I. *Sexual Abuse of Jane Doe 1 (Counts 1 and 2).*

### A. **Jane Doe 1.**

Born in June 2004, Jane Doe 1 was 19 years old at trial.  She testified that defendant was a close family friend.  When she was 9 or 10 years old, defendant would hold her hand and touch her waist.

Between the ages of 10 and 12, Jane Doe 1 and her younger brother, Santino, often spent the weekend with defendant and his son, Isaac, who was close to their ages.  Defendant would take the children to a restaurant or an amusement park.  While defendant drove, Jane Doe 1 usually sat in the front seat and the two boys usually sat in the back seat.  Defendant would reach his hand over the center console and touch Jane Doe 1's thigh or vagina over her clothes.  She would move his hand away.  Sometimes, defendant would take Jane Doe 1 to a coffee shop by herself, and he would touch her thigh while she was seated in the front seat.

---

[1] Unless otherwise stated, all statutory citations are to the Penal Code.

[2] Unless otherwise stated, all rule citations are to the California Rules of Court.

[3] At trial, the victims were referred to as Jane Doe 1 and Jane Doe 2.

Whenever Jane Doe 1 was with defendant, he would inappropriately touch her. He touched her thighs, butt, vagina, or breasts—in total, 100 to 200 times. Jane Doe 1 did not understand what was happening.

Defendant also touched Jane Doe 1 in his home on Pressley Street in South Park when she was between 10 and 12 years old. Isaac and Santino would be in Isaac's bedroom when this occurred. About 10 times, defendant put his finger inside her vagina while they were on the couch watching a movie. There were other when defendant touched her breasts while they were on the couch watching television or a movie. Once, he digitally penetrated her while she was using a social media application. She would put a pillow on her lap or leave the room to prevent defendant from touching her.

Sometimes, defendant played a game with the three children while they were under the blanket on the bed. During this game, he would touch Jane Doe 1 under the blanket. Once, Jane Doe 1 was sitting on defendant's bed when he grabbed her wrist and forced her to touch his penis. She tried to pull her hand away, but he would not let her go.

Defendant's abuse stopped when Jane Doe 1 was 12 or 13 years old. Defendant tried to touch her, but she forced him away. He asked whether she had a boyfriend, and she replied no. She then texted her mother to pick her up. Afterward, Jane Doe 1 stopped going to defendant's house, although she continued to see him at family gatherings.

Eventually, Jane Doe 1 told her aunt, Jane Doe 2, that defendant molested her. Jane Doe 2 responded that he had done the same thing to her. Later, Jane Doe 1 also told her best friend about defendant's abuse.

In December 2020, a year or two after disclosing defendant's abuse to Jane Doe 2, Jane Doe 1 told her mother. By this time, she was 16 years old.

The next day, she and her mother went to the police station to make a report. A few days later, Jane Doe 1 underwent a forensic interview regarding defendant's conduct.

### B. Santino.

Santino was one year younger than his sister, Jane Doe 1. Santino recalled that from ages 6 to 12 or 14, defendant would take Isaac, Jane Doe 1, and him every few weeks or every other month to an amusement park, a laser tag park, or a restaurant. Usually, Jane Doe 1 sat in the front seat of defendant's car. Santino would look out the window as defendant drove.

Santino also recalled that he and Jane Doe 1 often spent the night at defendant and Isaac's house. They played games and watched movies. Jane Doe 1 would always be on defendant's team. Defendant gave Jane Doe 1 "a lot" of affection, as if she were his "favorite child." Defendant gave Jane Doe 1 full hugs and would watch movies with his arm around her shoulder.

Santino usually slept with Isaac in Isaac's room. He did not know where Jane Doe 1 slept. Santino was 14 or 15 years old when he last slept at defendant's house.

### C. Danielle.

Danielle is Jane Doe 1 and Santino's mother. Danielle described defendant as a "really good family friend." In 2011–2012, the family saw defendant several times a week, including holidays and birthdays. For four or five years, defendant regularly took her children on outings and hosted sleepovers. In fact, when Jane Doe 1 was 13 years old, she and Santino spent every other weekend at defendant's house. Danielle did not see defendant interact with her children.

4

In 2017, Danielle found several text messages from defendant to Jane Doe 1, who was 12 or 13 years old. In these messages, defendant asked Jane Doe 1 what she was doing, if she wanted to come over that weekend, and if he could take her to school. Danielle thought these messages were inappropriate and uncommon, since defendant usually communicated directly with her. She decided not to let Jane Doe 1 go to his house again. However, Danielle remained on good terms with defendant when she saw him at family functions. She did not suspect any inappropriate physical conduct occurred between defendant and Jane Doe 1 until December 2020, when Jane Doe 1, who was unable to breathe and crying "hysterically," told her about his abuse. She was shocked and felt guilty for not knowing sooner. Danielle called her mother to tell her what happened. Jane Doe 2, Danielle's sister, may have been present on the call.

On December 6, 2020, Danielle and Jane Doe 1 reported defendant's abuse to the police.

### D. Sergeant Rick Boehm.

Sergeant Boehm spoke with Jane Doe 1 on December 9, 2020. He arranged a forensic interview for her on the same day. During this interview, Jane Doe 1 stated that defendant molested her from when she was 7 to when she was 13 or 14 years old.

## II. *Sexual Abuse of Jane Doe 2 (Count 1).*

### A. Jane Doe 2.

Jane Doe 2, born in August 1997, was 26 years old at the time of trial. She was Danielle's sister and Jane Doe 1's aunt. Jane Doe 2 testified that when she was a child, defendant frequently drove her to school; took her to a restaurant with his children, Isaac and Isabelle; and hosted her for sleepovers.

5

When she was 11 or 12 years old, defendant forcibly kissed her a few times by inserting his tongue into her mouth. About five times, she was able to prevent his kisses. Another time, he forcibly "[made] out" with her. One day at her house, he touched her breasts under her shirt for 30 or 40 seconds. Her dad entered the room but did not see what was happening. Afterward, defendant took her to the store to get a drink. Jane Doe 2 sat in the back seat of his car. Defendant told her to tell him if he made her uncomfortable. She was scared and remained silent. Eventually, however, she got in the front seat.

Jane Doe 2 disliked getting into the car with defendant because she feared he would touch her. When she was 11 or 12 years old, he would touch or rub her thigh while driving. She "vividly" recalled six times when this occurred.

Around the same time, defendant twice touched her butt over her pants. Once, while defendant was hugging Jane Doe 2 at the front door of his house, he firmly grabbed her butt with both hands.

Jane Doe 2 never told anyone about defendant's abuse because she was embarrassed. When Jane Doe 2 saw defendant at family gatherings, she was not friendly toward him.

One day, Jane Doe 2's niece, Jane Doe 1, told her that defendant molested her. Jane Doe 2 cried and shared that defendant also molested her. However, Jane Doe 2 did not tell anyone else because she believed it was Jane Doe 1's story to tell.

Later, Jane Doe 2's sister, Danielle, told her that defendant abused Jane Doe 1. Jane Doe 2 told Danielle that she already knew and that he abused her too. Jane Doe 2 also told her mother, who asked why she never

6

said anything. Jane Doe 2 responded that she was young and scared and did not know how to tell her.

### B. Sergeant Boehm.

Sergeant Boehm interviewed Jane Doe 2 by phone on December 8, 2020. Jane Doe 2 told him that defendant first inappropriately touched her when she was 12 years old. Other touching occurred when she was 13 years old. At the time, defendant lived on Pressley Street. Several times, defendant inappropriately touched Jane Doe 2 during sleepovers at his house. Defendant fondled her breasts, butt, and vaginal area over her clothing. He also kissed and touched her while they were alone together in his car.

Jane Doe 2 told Sergeant Boehm that defendant also molested her at the house where she lived with her parents. Once, Jane Doe 2's father walked in the room while defendant was molesting her as she played on the computer. Jane Doe 2 estimated that defendant molested her about 10 times, when she was about the same age as Jane Doe 1.

Sergeant Boehm acknowledged that Jane Doe 2 testified at trial the inappropriate touching occurred in defendant's car or her at her house but not at his Pressley Street house.

## III. *Uncharged Prior Sex Crimes.*

Noemi A., a cousin of Jane Doe 1, Jane Doe 2, and Danielle, was 36 years old at the time of trial. Noemi met defendant, a family friend, when she was 11 or 12 years old. Defendant was seven years older than her.

When Noemi was 15 or 16 years old, defendant often drove her to and from school. She would call or text him to ask for rides. While they were inside his car, defendant would grab Noemi's hand and try to put it on his penis over his clothes, even if Isaac was in the back seat.

7

When Noemi was 15 to 17 years old, defendant started grabbing her breasts under her shirt while she was in his car. They would park "somewhere private where no one could see" and "make out" inside his car.

The day before her 16th birthday, Noemi and her mother visited defendant's home in Coffey Park. At one point, defendant grabbed Noemi from behind, hugged her, and kissed her neck.

About a year later, defendant moved to a house on Pressley Street in South Park with his parents and sister. Defendant and Noemi, then 17 years old, had sex in this house about two or three times a month when no one else was home. Their "fling" was a secret.

Their "on and off" relationship lasted until Noemi was almost 20 years old. In or around May 2008, Noemi started dating her eventual husband.

Noemi learned about defendant's abuse of Jane Doe 1 when Danielle called to tell her. Danielle was also aware of Noemi and defendant's relationship.

## IV. *Expert Testimony on CSAAS.*

Dr. Tiffany Anderson, a clinical psychologist, testified that it is common for child sexual abuse victims to delay reporting the abuse or to report it in a piecemeal fashion. According to Dr. Anderson, CSAAS describes five components or patterns of behavior in children who have suffered sexual abuse: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction. CSAAS does not diagnose abuse. Rather, it assumes a child has been abused and provides a way to explain to adults the child's seemingly counterintuitive behavior. The patterns observed by CSAAS are usually a consequence of the fact that the abused child has an ongoing relationship with the abuser. The abuser may "enforce the secrecy," among other things, by force or something "[as] simple" as

8

giving the child special attention or favors. The child victim may, in turn, feel afraid and helpless and, thus, delay reporting the sexual abuse, give vague or incomplete descriptions, report the abuse over time in an incremental or piecemeal fashion, or recant his or her disclosures.

## V. *Defendant's Case.*

Defendant was a good friend of Noemi's aunt and uncle. Noemi lived with them off and on when she was in high school. Defendant was never alone in the car with Noemi when she was 14 or 15 years old. Whenever he gave her a ride to school, Jessica, Isaac's mother, was with them.

Defendant recalled hosting Noemi's 16th birthday party; however, he denied touching her inappropriately when she visited his house with her mother the day before her birthday. He did not have sexual contact with Noemi until she was 19 years old. Defendant first had sexual intercourse with Noemi in January 2007 when he lived on Pressley Street.

In 2002 and 2003, defendant lived in the Coffey Park area with his son, Isaac; Isaac's mother, Jessica; Jessica's daughter, Isabelle; and other people. A few times, Jane Doe 2 came to the house for playdates; however, she did not sleep over. Most of the time, defendant and Jessica spent time with Jane Doe 2 outside the house.[4]

Defendant moved to 915 Pressley Street in 2005 after calling off his wedding to Jessica. Isaac regularly stayed with him. Jane Doe 2 visited the home for playdates. However, according to Jessica, Jane Doe 2 did not sleep over, given the limited space in his house.

Defendant occasionally took Jane Doe 2 to get a movie to take home to watch with the family. Once, he also picked her up from middle school when

---

[4] The children also had playdates at Jane Doe 1 and Jane Doe 2's grandmother's home.

9

her grandmother, Debbie, asked him to. Around 2009, defendant, once or twice a year, would take Jane Doe 2 to an amusement park with Isaac and Isabelle. Defendant "[a]bsolutely [did] not" inappropriately touch Jane Doe 2 at her grandmother's house as she alleged.

Around 2013, defendant moved to 907 Pressley Street. During this time period, defendant recalled playing games such as charades or board games, watching movies, and eating ice cream with Isaac, Jane Doe 1, and Santino. Around 9 or 10 p.m., defendant would take Jane Doe 1 and Santino home.

In the summers of 2014 and 2015, defendant recalled Jane Doe 2 and Santino's spending the night with Isaac three to five times. Jane Doe 2 slept on the couch. He always arranged the sleepovers with their mom. These sleepovers stopped in 2015 because Isaac became more isolated due to a medical condition and preferred spending more time with a friend.

Defendant never inappropriately touched Jane Doe 1. Nor did he watch a movie alone with Jane Doe 1, sleep with her in his bed, or take her alone to a coffee shop.

## VI. *Verdict, Sentencing and Appeal.*

On December 19, 2023, the jury found defendant guilty as charged and found true the multiple-victim allegation. In a bifurcated proceeding, the trial court found true two aggravating factors: the victims were particularly vulnerable (rule 4.421(a)(3)) and defendant took advantage of a position of trust or confidence (rule 4.421(a)(11)).

On August 19, 2024, the trial court sentenced defendant to an aggregate prison term of 28 years. This timely appeal followed.

10

## DISCUSSION

Defendant contends the trial court abused its discretion by admitting the CSAAS testimony because it was unreliable, irrelevant, and unduly prejudicial. He further contends the trial court committed prejudicial error by instructing the jury under CALCRIM No. 1193 that it could consider the CSAAS testimony to assess the credibility of Jane Doe 1 and Jane Doe 2 and thereby to determine the truth of their allegations. We address each issue in turn.

## I.      *The Expert Testimony On CSAAS Was Admissible.*

Before trial, defendant moved in limine to exclude expert testimony regarding CSAAS on the grounds that such testimony was unreliable, overly prejudicial, and had a strong likelihood of misleading the jury. The trial court denied the motion, finding the CSAAS testimony would assist the jury in evaluating the credibility of the alleged victims and would not be admitted to prove the alleged victims actually suffered abuse. The court also found the probative value of the testimony was not substantially outweighed by its undue prejudice, noting that limiting instructions would be given to the jury once the expert testified. Defendant contends this decision was prejudicial error. The following rules apply.

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) A trial court has broad discretion to decide whether to admit expert testimony. (*People v. Duong* (2020) 10 Cal.5th 36, 60.) On appeal, the court's decision is reviewed only for abuse of discretion. (*Ibid.*) "An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence 'resulted in a miscarriage of justice.' (Evid. Code, § 353, subd. (b).) In a criminal case, a miscarriage of

11

justice can only be found when the reviewing court determines it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170, fn. omitted (*Lapenias*).)

Defendant argues the trial court abused its discretion by admitting Dr. Anderson's testimony regarding CSAAS without considering whether CSAAS evidence was scientifically reliable under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*) or whether any particular component of CSAAS was relevant to his case. The result, he says, was undue prejudice. We disagree.

As an initial matter, we reject defendant's suggestion that CSAAS testimony in general runs afoul of the rules of admissibility set forth in *Kelly* and *Frye*. As case law explains: "The *Kelly* rule applies only to expert testimony 'based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [citations].) [Further, t]he *Kelly* rule applies only if 'the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data.' (*Ibid.*)" (*Lapenias, supra*, 67 Cal.App.5th at p. 173.)

Thus, CSAAS testimony falls outside the scope of the *Kelly* rule for two reasons: It is not new and "does not purport to provide a definitive truth . . . ." (*Lapenias, supra*, 67 Cal.App.5th at p. 173; accord, *People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*) [CSAAS testimony is not "*new* experimental scientific evidence 'not previously accepted in court' "].) Rather, CSAAS testimony is " 'based on [the expert's] clinical experience with

child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' [Citations.]" (*Munch, supra*, at p. 473.)

Moreover, contrary to defendant's position, a long line of California courts, over three decades, have deemed CSAAS expert testimony admissible for the limited purpose of explaining how and why child victims may react in unexpected and perhaps counterintuitive ways to having been sexually abused. (E.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 394–395; *People v. Sedano* (2023) 88 Cal.App.5th 474, 479; *Lapenias, supra*, 67 Cal.App.5th at p. 171; *Munch, supra*, 52 Cal.App.5th at p. 468.) As the California Supreme Court explains, CSAAS evidence is "not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301, fn. omitted.)

Thus, a CSAAS expert may not " 'vouch[] for the veracity' " of the alleged victim (*Lapenias, supra*, 67 Cal.App.5th at p. 180); opine on whether the victim is telling the truth (*Munch, supra*, 52 Cal.App.5th at p. 468); or give " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused" (*People v. Julian* (2019)

34 Cal.App.5th 878, 885). However, the expert may explain CSAAS "to rehabilitate [an alleged victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at p. 1300.)

Here, there is no question the People's expert stayed within these permissible legal bounds. Dr. Anderson explained her testimony was based on years of clinical experience with child sexual abuse victims and her familiarity with a wealth of professional studies on CSAAS dating from the early 1980's to the recent 2020's. After describing the five common patterns exhibited by child abuse victims, Dr. Anderson made clear that not all victims exhibit any or all of them. She also explained that CSAAS is not a medical diagnosis but, rather, a tool to educate adults about the sometimes surprising behaviors exhibited by child sexual abuse victims. Importantly, Dr. Anderson made clear she had never spoken to the alleged victims or reviewed any evidence in this case.

Defendant nonetheless insists Dr. Anderson's testimony was irrelevant and unnecessary because child sexual abuse is not "outside the ken of common experience" and the victims themselves gave " 'sound reasons' " for their delayed, incremental disclosures. We disagree. His defense was that the alleged abuse did not occur and that the victims were lying as evidenced by their inconsistent and belated remembrances. As such, the CSAAS testimony was indeed relevant, as Dr. Anderson explained, to educate the jurors about the sometimes counterintuitive patterns of behavior exhibited by child sexual abuse victims.

Further, to the extent defendant complains the CSAAS testimony was unnecessary in this case, he has not proven prejudicial error. "[E]ven if we

14

were to assume that all the empaneled jurors were fully aware of all five components of CSAAS, we would then find [Dr. Anderson's] testimony to be merely cumulative and therefore not prejudicial." (*Lapenias, supra*, 67 Cal.App.5th at pp. 172–173.)

Moreover, defense counsel had ample opportunity to test the strength of Dr. Anderson's opinions on cross-examination. Defense counsel could have called, but chose not to call, a rebuttal expert. And, following Dr. Anderson's testimony, the trial court instructed the jury on the limits of CSAAS evidence by giving a version of CALCRIM No. 1193, the propriety of which is discussed *post*.[5] This instruction stated, in relevant part, that Dr. Anderson's testimony was offered "only to explain certain behavior of an alleged victim of child sexual abuse" and "is not evidence that the defendant committed any of the [charged or uncharged] crimes . . . ." Under these circumstances, there was no abuse of discretion, much less prejudicial error in the admission of the testimony.

---

[5] The modified version of CALCRIM No. 1193 read to the jury stated: "You have heard testimony from Dr. Tiffany Anderson regarding child sexual abuse accommodation syndrome.

"Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse.

"Dr. Tiffany Anderson's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.

"You may consider this evidence only in deciding whether or not Jane Doe 1's or Jane Doe 2's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim."

Finally, we reject defendant's invitation to join a minority of jurisdictions, including Kentucky and New Jersey, that have held CSAAS evidence is inadmissible as a matter of law. We are bound by and supportive of California Supreme Court precedent that has long accepted CSAAS evidence as relevant and helpful to a jury called upon to consider a child witness's credibility when, as here, the defendant suggests the child's subsequent conduct is inconsistent with his or her allegations of sexual abuse. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The ruling stands.

## II.    *No Instructional Error in Giving CALCRIM No. 1193.*

Defendant also challenges CALCRIM No. 1193, a modified version of which was given to the jury, as legally incorrect. According to defendant, this instruction "effectively and improperly tells the jury that CSAAS testimony can indeed be considered as proof the abuse occurred." This is so, defendant reasons, because "[CALCRIM] No. 1193 advises the jury that believability is the equivalent of truth-telling." As a result, he claims the People's burden to prove him guilty beyond a reasonable doubt was lessened, violating his constitutional rights. We disagree.[6]

"We review a claim of instructional error de novo. [Citation.] 'When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine

---

[6] We reject the People's claim that defendant forfeited his instructional challenge by failing to raise an objection at trial. "Generally, an instruction may not be challenged on appeal unless the party made an appropriate objection at trial. [Citation.] But a challenge may be raised where the claim, like [defendant's] here, alleges that the instruction was not correct in law or affected the defendant's substantial rights." (*People v. Sexton* (2019) 37 Cal.App.5th 457, 466.)

16

whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 419.)

Defendant's argument, that CALCRIM No. 1193 "effectively" permitted the jury to consider Dr. Anderson's testimony as proof of his guilt, flies in the face of the actual instruction given in this case. In fact, the court's modified version of CALCRIM No. 1193 told the jury in no uncertain terms that Dr. Anderson's testimony was "not evidence" that defendant committed any crime and could only be considered in deciding whether the victims' conduct was "consistent with the conduct of someone who has been molested" and whether their testimony was "believab[le]."

Defendant insists there is no practical difference between "instructing the jury that although CSAAS evidence cannot be used to determine if the allegations are true, they can use that evidence to determine if the complainant's testimony is believable." Our appellate colleagues in the Fourth Appellate District quite recently, and persuasively, rejected this argument: "We are not the first appellate court to reject the argument that CALCRIM No. 1193 impermissibly permits jurors to consider CSAAS testimony as evidence of guilt. . . . [S]everal others have done so. In [*People v. Gonzales* (2017)] 16 Cal.App.5th 494, the defendant 'argue[d] it is impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [the defendant] committed the charged crimes.' (*Id*. at p. 503.) In rejecting this argument, the Court of Appeal explained: 'A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes

17

the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.' (*Gonzales*, at p. 504.)  Other cases have followed *Gonzales*. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 219–220 [citations]; [*People v. Ortiz* (2023)] 96 Cal.App.5th [768,] 815–816; *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176; [*Munch, supra*,] 52 Cal.App.5th [at pp.] 473–474 [citations].)  We agree with these decisions . . . ." (*People v. Page* (2025) 114 Cal.App.5th 1022, 1030, 1st & 2d bracketed insertions added.)  We do too; accordingly, we follow these decisions here in rejecting defendant's argument.[7]

In brief, we have no doubt that reasonable jurors, given the modified version of CALCRIM No. 1193 used in this case, would understand the limits imposed on their use of the CSAAS testimony offered by Dr. Anderson. As such, it was not reasonably likely that any juror misunderstood this instruction as permitting use of the CSAAS testimony as evidence defendant committed any of the charged or uncharged crimes.  Defendant's instructional challenge thus fails.  (E.g., *People v. Page, supra*, 114 Cal.App.5th at p. 1030, and cases cited therein.)

---

[7] Defendant claims that unlike CALCRIM No. 1193, CALJIC No. 10.64 "is a legally correct version of the [CSAAS] instruction" in that it "omits the believability language" and instructs the jury "that CSAAS testimony can be considered 'only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested.' (CALJIC No. 10.64 (Spring 2010 Ed.)."  The issue at hand is whether the giving of CALCRIM No. 1193 was proper, not whether it is more or less clear than CALJIC 10.64.  In any event, defendant could have requested, but did not request, that CALJIC 10.64 be given instead of CALCRIM No. 1193.  As such, his claim rings hollow.

# DISPOSITION

The judgment is affirmed.


Jackson, P. J.

WE CONCUR:

Burns, J.
Chou, J.

A171742/*People v. Victor David Magallon*